H. B. CLAFLIN & COMPANY et al.

*v.*

JULIUS FREUDENTHAL et al.

---

DANIEL A. CURRIE

*v.*

JULIUS FREUDENTHAL et al.

[Filed May 20th, 1899.]

Upon the proofs established—*Held*, that the deeds in question were not col-lusively withheld from record and are not fraudulent as against complainants.

---

Heard on bills, answers, replications and proofs.

*Mr. Hart, Mr. George R. Dutton, Mr. Charles E. Hill* and *Mr. Edward M. Colie,* for the complainants.

*Mr. Eugene Stevenson,* for the defendants.

EMERY, V. C.

These are creditors' suits consolidated for the purpose of hearing, and the bills are filed to set aside as fraudulent a deed executed by Julius Freudenthal, the debtor, to Bernard Katz, one of the defendants, for lands in Englewood, N. J. The deed in question was dated June 9th, 1896, acknowledged June 10th, 1896, and recorded on the following day. The consideration named in the deed is "one dollar and other valuable considerations." The complainants in both suits are attachment creditors under writs issued subsequent to the recording of the deed. The allegation in the Currie bill is that the deed of June 6th, 1896, was made by the debtor, in combination with Katz, to defraud complainant and other creditors and to prevent the recovery of their debts; that the deed was without consideration and that the property is worth $35,000 or $40,000. No further

particular allegations of fraud are made in the Currie bill. In the Claflin bill it is alleged that Freudenthal, being insolvent, and for the purpose of defrauding complainant, and without any or upon a totally inadequate and merely colorable consideration, gave the deed in question, and that there was no good or valid consideration for the deed; that the land was worth $75,000; that Katz was a relative of Freudenthal and must have known of the large value of the land, and that the debtor was attempting to defraud complainant and his other creditors, by the deed, and that the whole transaction was a scheme to remove the land from liability to attachment. The latter bill asks also a discovery of the consideration paid for the conveyance and the "good causes and considerations" mentioned in the deed. The answers of defendant Katz undertake to disclose "the facts and circumstances which led to the giving of the deed," and say substantially, that for a long time prior to the date of the deed he had been furnishing to Freudenthal, purely for the accommodation of the latter, his (Katz's) promissory notes, signed by him as maker, which Freudenthal discounted or sold in the market for his own benefit, using the proceeds solely for his own business and purposes, and that like notes signed by the firm of Katz Brothers were also given to Freudenthal and similarly disposed of; that the amount of these accommodation notes was at one time as large as $50,000, and the notes were renewed from time to time, and that at the time the deed was given notes of this character were outstanding to the amount of $44,000, $37,000 being notes of Bernard Katz and $9,000 of Katz Brothers, upon which notes Freudenthal had paid $2,000. A list of the outstanding notes—six in number—dated from November 30th, 1895, to May 26th, 1896, due at various dates from June 30th, 1896, to November 26th, 1896, is given, and it is said that all of these notes represented by renewal, notes given and renewed a long time previous to the dates thereof respectively. The answers then allege that shortly before the date of the deed Freudenthal informed defendant Bernard Katz that he would be unable to take up these outstanding notes or either of them at maturity, and he desired Katz to assume their payment and

release Freudenthal therefrom, offering to convey the property in question, his homestead, absolutely, as satisfaction for the assumption .by defendant Katz of the outstanding promissory notes.   Defendant, believing he could get no better recompense or reimbursement, alleges that he accepted the deed upon this basis, took immediate possession of the property and at the time of the answer, September 16th, 1896, had paid three of the notes, and intended to pay the balance as they matured ; that all of the notes were in the hands of *bona fide* holders and that the obligation of the makers thereof was complete at the time of the execution and delivery of the deed.   No disclosure is made in the answer of any security upon the property being held by defendant previous to the delivery of the deed, or that the surrender of any such security formed part of the consideration of the transaction.

The transactions and dealings between Freudenthal and Katz have been investigated on the hearing exhaustively and in great detail, and the defendant has satisfactorily established that the deed was given and accepted in consideration of Katz assuming the payment of $44,000 of notes outstanding in the hands of *bona fide* holders, which Katz and Katz Brothers had signed for Freudenthal's accommodation, and that at the time of the hearing all of these notes thus assumed had been paid by Katz.   It was also admitted at the hearing and for the purpose of the suit, that the value of the property in question at the time of the conveyance was $44,000.   Defendant Katz and Katz Brothers, upon the negotiation of their accommodation notes to *bona fide* holders, became, as between themselves and Freudenthal, creditors of the latter, and the assumption of payment of these accommodation notes by the acceptance of the deed and the discharge of the liability of Freudenthal upon these notes, constituted them purchasers for value.   It appeared, however, at the hearing, and was first disclosed by the evidence of defendant Bernard Katz, that as long ago as 1892 and some years after the accommodation notes began to be made, Freudenthal executed to Katz and Katz Brothers a deed for the property as security against liability on the notes, which deed Katz, at Freudenthal's request,

agreed not to record, and that in October, 1895, this first deed was returned to Freudenthal and another deed to Bernard Katz and Philip Katz, which included a tract not embraced in the first deed, was received in place thereof for the same purpose of security, and with the same agreement not to record. The debts of complainants were incurred while these previous deeds were unrecorded, and the debts of some of the complainants were incurred in reliance on statements made by Freudenthal before the deed of June, 1896, in relation to his property, by which statements it appears that in addition to other property he owned the Englewood property unencumbered. There was no disclosure to the persons to whom the statements were made that Katz held the unrecorded deed as security. It is claimed by complainants that the retention of these prior deeds from the record, taken in connection with all the circumstances of their retention, was a fraud on them as creditors, which would entitle them to relief against these unrecorded deeds, if set up by Katz, and that this fraud has not been purged by the execution of the deed of June, 1896, but also invalidates this deed as based either wholly or in part on the previous fraudulent transaction. The defendant, in reference to any claim for relief based on the alleged fraud or invalidity of the previous unrecorded deeds, raises the preliminary objection that the deed of June, 1896, is the only deed attacked in the bill, and that a claim for relief based upon the alleged frauds in previous deeds is not within the issues, and that the defendant has had by the pleadings or during the hearing no notice of such issue, or warning or opportunity to prepare defences arising thereon. I think, however, that the existence and surrender of the previous deed, held as security against future liabilities, entered into and formed part of the consideration of the deed of June, 1896, and that under the issues on the pleadings as they stand, in reference to the fraudulent character of this last deed and its consideration, evidence as to the entire consideration, in all its details, is relevant and admissible. If there is any doubt on this point, an amendment to the bill would now be allowed specially charging the fraud in the former deeds, which is now insisted on, inas-

much as the deeds were first disclosed, not by the answer, but by defendant on the hearing. This objection, therefore, is not well founded. The important questions in the cause are, first, whether the retention of these deeds, under all the circumstances of the case, made these deeds fraudulent against the complainant creditors or any of them, and if so, then, secondly, whether the deed of June, 1896, is affected by such fraud in the former deeds. In reference to the first question, the fraudulent character of the earlier deeds, which were given as security, the general rule of law applicable to the case is settled. These deeds in question were made for a valuable consideration, viz., the security of the makers of accommodation notes, negotiated by the payee to *bona fide* holders, and they must, therefore, be impeached by subsequent creditors on the ground of actual fraud in which the grantee has himself participated. *Flemington National Bank* v. *Jones, 5 Dick. Ch. Rep. 244 (Vice-Chancellor Pitney, 1892),* and cases cited at *p. 249;* affirmed on appeal for reasons stated, *Ibid., p. 486.* It is also settled by this case and by the later case, *Montgomery* v. *Phillips, 8 Dick. Ch. Rep. 203 (Errors and Appeals, 1895),* that the mere retention from the record by the mortgagee, at the request of the mortgagor, of a mortgage given to an endorser as security for future liability, is not of itself plenary evidence of actual fraud upon a subsequent mortgagor or judgment creditor. The question as to the existence of actual fraud depends upon the individual circumstances of each case, and in the present case, the facts which seem to me to be relevant on the decision of this question, are as follows : Bernard Katz and his brother, Philip Katz, under the name of Katz Brothers, carried on the business of brewers on a large scale at Paterson previous to 1890, about which time their brewing business and properties were consolidated with others into the Consolidated Paterson Brewing Company, in which they had the sole or controlling interest. Freudenthal was the uncle of Bernard Katz's wife, and previous to 1890 and as early as 1887, Katz Brothers had made for his accommodation notes to the amount of $50,000, without security. Freudenthal was then engaged in business in New York and had the reputation

of being a man of large wealth, he and his two nephews, named Henry and Charles Lesinsky, having sold mining properties in the west for very large sums, and Bernard Katz, who acted for Katz Brothers in the matter, at the time of these accommodations, supposed Freudenthal to be wealthy. Freudenthal was the sole or principal owner of the Columbia Typewriter Company, which manufactured typewriters in New York, and he was also a buyer in New York for western houses. These accommodation notes were made without any questions being asked about Freudenthal's business situation. He then lived at Englewood, New Jersey, where he has purchased a valuable homestead and lived like a man of wealth. After the incorporation of the brewing company the giving of the accommodation notes continued, but the notes were, for business reasons, made by Bernard Katz alone and not by Katz Brothers. After the accommodation had continued for some years (the notes being regularly renewed), and in 1891 or 1892 Katz, according to his account, said to Freudenthal: "Here, uncle, we can't tell what can happen, I would like to have a deed from you; give me the deed so that I will be secured, because we can't tell what may happen." Freudenthal, on this request, made a deed for all the property he then had in Englewood, being his homestead property. Katz, on his direct examination, stated that he promised his uncle that he wouldn't record the deed, and his evidence on cross-examination as to the arrangement, is as follows:

"Q. * * * You arranged with him that you would not put the deed on record, didn't you?

"A. Yes, sir; I promised him that I wouldn't put it on record.

"Q. He told you the objections to putting it on record, it would hurt his credit?

"A. No, he merely didn't want it on record, he didn't say any reason.

"Q. You knew it would hurt his credit?

"A. No, I think he done it more for his pride; he was a very proud man in Englewood, and he didn't want to have it on."

After the delivery of this deed Freudenthal purchased additional property at Englewood, and in October, 1895, at Katz's request, another deed was made, dated October 29th, 1895, including

the property described in the first deed and the additional pur-
chase, and upon the delivery of this second deed the first deed was
returned or destroyed.   The second deed was not recorded, and
Katz's statement in reference to this is simply that he promised
to keep that off the record.   Katz's statement is the only direct
evidence as to the intention of the parties in keeping the deeds
from the record, and the only evidence or statement on the part
of Freudenthal is contained in his letter to Katz, as late as
April 8th, 1896, in which, referring to the deed of October,
1895, he says, " while I live there will be no need of using the
deed."   According to Katz's statement, Katz Brothers, previous
to signing the $50,000 accommodation notes, had received from
Freudenthal his notes for their accommodation, but to a much
smaller amount—$5,000 to $10,000 and perhaps as high at one
time as $25,000—and this accommodation, while not continuous,
occurred at intervals during the whole time now in question, up
to a year or so previous to Freudenthal's failure in June, 1896.
Defendant's witness, Levy, the confidential clerk of Freudenthal,
thinks the accommodation may have continued up to the time of
the failure, but is not sure.   After 1890 Katz Brothers loaned
to Freudenthal, at his request, $50,000 in brewing company
bonds, for the purpose of his borrowing money on them, the
same being without security.   Subsequently, $13,000 of these
bonds were returned, but the balance were pledged as collateral
for a loan of about $27,000 for the benefit of L. B. Freudenthal
& Company, a firm of El Pasco, Texas (composed of Julius Freu-
denthal's son and nephew), for whom Julius Freudenthal pro-
cured the bonds, on which loan Katz was also responsible, and
for which, until after the time of the failure, he held no security.
Later on and in 1893 Freudenthal, who was then still engaged
in the manufacture of typewriters, applied to Katz for further
accommodation notes, but Katz refused to give further accom-
modation unless secured, and this security was furnished by the
personal notes of Henry Lesinsky and Charles Lesinsky and by
notes of the Columbia Typewriter Company.   No other security
was furnished to Katz for these accommodations, which amounted
to over $100,000.   The Lesinskys, who had been formerly

partners of Freudenthal, had retired from business and were men of wealth, and they gave their notes to Katz. As to the responsibility of the typewriter company, Katz relied on Freudenthal's statements as to its prosperous condition, and does not appear to have had or sought other information. Katz, on receiving from Freudenthal the notes of the Lesinskys and the typewriter company to secure his notes, signed additional accommodation notes for Freudenthal's use at New York banks, and continued the whole series of accommodation notes up to June 6th, 1896, so that at that time the entire amount of Katz and Katz Brothers' accommodation notes or endorsements outstanding was $183,500, secured as follows:

| | | | |
|---|---|---:|---:|
| By Englewood property | | $46,000 | |
| " Henry Lesinsky notes | $65,000 | | |
| less | 3,000 | | |
| | | 62,000 | |
| " Charles Lesinsky notes | | 28,000 | |
| " Typewriter Co. notes | | 18,500 | |
| | Total secured, | | $154,500 |
| Unsecured—L. B. Freudenthal & Co. loan on, | | | 29,000 |
| | | | $183,500 |

The latter item of $29,000 was subsequently partially satisfied or realized by a transfer to Katz Brothers or for their benefit, of property at El Pasco, Texas, held by L. B. Freudenthal & Company (endorsers or makers liable to Katz Brothers), and for whose benefit the loan of the bonds was originally made to J. Freudenthal. During the time when these accommodation notes were being made Freudenthal was incurring liabilities by discounts in banks and otherwise, beyond the notes given by Katz, but it does not appear that he ever disclosed this fact to Katz, or that Katz knew of the extent of his liabilities, or that his business was in a hazardous condition, and Freudenthal's representations to Katz, as to the condition of the typewriter company —Freudenthal's principal business—were always favorable, even to within a short time of his failure. A day or two before June 6th, 1896, Freudenthal notified Katz that he could no longer

take care of the accommodation notes, and that Katz would have to pay them. Katz at once consulted counsel, informing him of the deed held as security, and after receiving the advice of counsel, subsequently, and on June 6th, 1896, agreed with Freudenthal to pay the $46,000 of notes outstanding, for which the deed of the Englewood property was held as security, and to receive therefor an absolute deed of the Englewood property and $2,000 in cash. The deed in question was given to carry out this bargain, and it was agreed that the unrecorded deed of October, 1895, should be returned to Freudenthal. The $2,000 was paid on June 12th, 1896, by a check, but Freudenthal absconded on the same day, and the return of the deed of October, 1895, being thus prevented (as Katz says), still remains in Katz's possession. Freudenthal's failure carried down the Columbia Typewriter Company and L. B. Freudenthal & Company for whom he bought goods in New York, and for whose purchases he had become liable. The debts of the typewriter company seem to have been principally to banks to whom Freudenthal was indebted on discounts secured to some extent by bonds of the company. Katz, subsequent to the failure, with funds supplied by the Lesinskys, took up the notes of his own and Katz Brothers, which had been made on collateral security of the Lesinskys' notes, being about $83,000. The Lesinskys received from Freudenthal on June 12th, $16,000, on account of these notes, and they also received about $30,000 from the proceeds of Freudenthal's life insurance policies, which had been assigned to Henry Lesinsky and were cashed at surrender values. Katz lost nothing on these Lesinsky notes. Katz also took up the notes ($18,500) for which he held the typewriter notes as collateral, but on these he lost $9,250, and for the balance received $9,250 of bonds or securities of the company which succeeded it on reorganization, and these he still holds.

While the unrecorded deeds were outstanding Julius Freudenthal procured from the complainant, the Merchants and Traders Bank, credits and discounts for J. Freudenthal & Company, as a firm composed of himself and his son, Ludwin B. Freudenthal, upon written statements signed by himself. In the statement

of April 22d, 1895, the assets of the firm were stated at about $170,000 with liabilities of about $23,000, and his interest on the typewriter company bonds and stock was valued at $200,000, and his real estate and mortgages at over $260,000, including the Englewood property unencumbered at $74,000. The total assets were given as $648,731 and the total liabilities $22,636.72, with a contingent liability on endorsed bills of $122,335.19. A second statement made May 22d, 1896, substantially similar, gives total assets, $649,223.50; total liabilities, $24,396.27, with contingent liabilities on endorsed bills receivable outstanding, $118,020.90. The Englewood property is valued at $74.000. Written statements substantially similar as to assets and liabilities, and with the same valuation of the Englewood property unencumbered ($74,000), were made to the Franklin National Bank, the real owners of complainant Wylie's judgment, on July 8th, 1895, and May 1st, 1896, and in reliance on these statements a line of discount or credit was allowed J. Freudenthal & Company as endorsers of L. B. Freudenthal's paper. As to the other complainants it does not appear that their debts were incurred in reliance upon any statements of Freudenthal as to the Englewood property. It does not appear that Katz knew that these statements, or any of them, had been made, or that discounts or credits were in fact being obtained by Freudenthal on his statements that the Englewood property was unencumbered. The case of the complainants, as to proof of actual fraud on Katz's part in withholding the deeds from the record, rests mainly upon the contention that Katz knew or must have known of the hazardous nature of Freudenthal's business and of his extension of credit beyond what Katz himself was giving him, and that the deeds in question being for Freudenthal's homestead property, the recording of them, as Katz must be presumed to know, would at once destroy Freudenthal's credit, and the agreement to retain from the record must therefore have been with the intention of sustaining his credit and drawing in creditors on the credit of Freudenthal's ownership of the property unencumbered. This contention is not, in my judgment, well founded. Freudenthal seems to have concealed from

Katz his true situation at the time of receiving the accommodations, and by his statements in relation to his business, to have led him to believe, up to shortly before the time of his failure, that his business affairs were not in a hazardous condition but were prosperous. Katz's conduct in originally giving and continuing his credit for Freudenthal's accommodation, in loaning the brewing company bonds and in further loaning and continuing the credit of his name upon the personal security of the Lesinsky and typewriter company notes as collateral, are indications of confidence on his part in Freudenthal's responsibility which seem to negative any actual intention to defraud creditors, and until the disclosure of the insolvency in June, 1896, Katz had no information or reason to suppose that Freudenthal was insolvent or that his business was in peril. The fact that Katz, after 1892, required security, is the main circumstance in Katz's conduct relied on as indicating his opinion that Freudenthal's business and circumstances were hazardous; but it would, in my judgment, be exaggerating and misconstruing the effect of an act of ordinary business prudence, to consider the demand for security for these large additional accommodations as sufficient evidence that Katz either knew or believed that Freudenthal was insolvent or hopelessly involved.

The case of complainants must be based, therefore, upon the effect of the retention of the deed for the homestead from the record, while the endorsements were continuing, and while Freudenthal was obtaining credit to some extent on the strength of its occupation and ownership.

Several cases have been cited which hold that where a deed of mortgage of lands is retained from record, under circumstances which show an intention on the part of the mortgagee or grantee, as well as the grantor or mortgagor, to draw in creditors of the grantor or mortgagor on the faith of his ownership of the lands unencumbered, the retention from the record will make fraudulent against creditors so drawn in, a deed or mortgage originally valid and on full consideration. This preference of subsequent creditors, who became such in reliance on the debtor's ownership of the property, over the secret or unrecorded mortgage or deed,

H. B. Claflin & Co. v. Freudenthal.

is based, not on rights resulting from the registry acts, but upon conduct of the mortgagee or grantee as well as the debtor, which is actually fraudulent against subsequent creditors and fraudulent at common law dependent of registry acts. In some cases the withholding of the instrument from record for the purpose of helping the mercantile or general credit of the mortgagor is held to be plenary proof of actual fraud, but this doctrine has not been adopted in our courts. *Flemington National Bank* v. *Jones, 5 Dick. Ch. Rep. 259, 260;* affirmed *Ibid., p. 486.* And in the latest case, *Montgomery* v. *Phillips, 8 Dick. Ch. Rep. 203 (Errors and Appeals, 1895)*, the effect as against subsequent creditors of retaining from the record real estate mortgages, was directly involved, and the rule declared to be (at *p. 219*) " that the mere failure to record a mortgage is not of itself a conclusive reason for setting it aside for the benefit of subsequent creditors, but that any concealment of an instrument of this kind is a badge of fraud, which may by reason of the circumstances surrounding the concealment be sufficient ground for avoiding the instrument in respect to subsequent creditors." The fact in this case that the unrecorded deed was for the debtor's homestead property, rather than other lands, is urged as decisively indicating the intention of both parties, on the retention of the deed, to be the giving a false credit to Freudenthal, and it is said that the placing of the deeds for his homestead on record would at once have destroyed Freudenthal's credit. Whether it would have had this effect is doubtful. The record of a deed upon nominal consideration would undoubtedly call for explanation from Freudenthal, but if he gave the true explanation, viz., that it was given to secure an endorser of responsibility, who had given to him the benefit of the endorser's own credit, it is not clear that Freudenthal's credit would have been seriously affected. With some creditors, those who discounted the notes of Katz so secured, it would strengthen the credit to be given to the notes. And the real question in reference to this retention of a deed for the homestead from record, is whether this was a certain inference under the circumstances, and whether Katz must be so conclusively presumed to be charged

with knowing it, as to make the mere retention a fraud. The fact that the property was the homestead is, in my judgment, simply one circumstance to consider in connection with the whole case, and cannot be given any such conclusive effect as is claimed. The question in every case where the unrecorded deed or mortgage is given upon a valuable consideration and the fraud charged is the retention of the instrument from the record, is whether under all the circumstances of the case the intent to hinder, delay or defraud these subsequent creditors, by retaining from the record, existed on the part of the grantee or mortgagee as well as upon the part of the grantor or mortgagor. In *Montgomery* v. *Phillips, supra,* the unrecorded mortgage in question was held under the circumstances to be fraudulent. The mortgage in that case was in fact in actual control of the mortgagor—a corporation which was embarrassed—the mortgage was given to secure the liability of the mortgagee as endorser on a note of the corporation discounted to pay (in part) its own debt to him—the future success of the company was problematical—the mortgage was to be given up if the company succeeded and to be recorded if it failed, and the experiment of its business was to be conducted by the mortgagee himself at the risk of future creditors. For the purpose of leaving the credit of the company unimpaired while the experiment continued, the mortgage which secured the debt and liability of the manager of the company's affairs and who created its subsequent debts, was kept from the record. These circumstances, in connection with the fact that the mortgagee continued in the active control of the mortgagor corporation from the time of the execution of the mortgage until its registry after the insolvency of the company, were sufficient to establish, as the court found (at *p. 221*), an arrangement equivalent to an agreement between the mortgagor and mortgagee to keep the mortgage from the record for the purpose of sustaining the credit of the company by concealing its existence, and the mortgage, although given for a valuable consideration, was therefore declared to be fraudulent against the subsequent creditors. "Sustaining the credit of the company" in this case was an actual drawing in of creditors by the direct

act of the mortgagee. No circumstances (beyond the retention from the record) of the same or like character appear in this case, nor does the evidence disclose facts from which it can be concluded that the deed was retained by Katz, the grantee, with the intention of drawing in creditors to trust Freudenthal on the faith of his ownership of the property unencumbered. Under the rule settled by the above cases, evidence sufficient to justify the finding of an intention on the part of the holder of the unrecorded instrument to assist in the drawing in of subsequent creditors, to give credit on the ownership of the lands, must appear, in order to make an instrument, valid in its inception, fraudulent by reason of its retention from the record. And in the present case the proof of such retention on Katz's part should clearly indicate this intention, and not be merely such as would give rise to a suspicion of its existence. The reason for requiring clear proof is that two facts appear in the case, which of themselves go far to negative the existence in Katz's mind of any such intention to draw in other creditors to their loss. First, he himself gave credit to Freudenthal largely beyond the amount he was secured for, and has been himself drawn in for a subsequent loss of over $20,000 beyond the loss he may sustain in the Englewood property if he be allowed to retain it. In the second place, the Englewood property, by the deed to him, has been, by Katz's payment of the notes on which he was surety, substantially appropriated to the payment of subsequent creditors of Freudenthal to the extent of $44,000, viz., those who discounted the notes on which Katz or Katz Brothers were sureties and including the Franklin Bank as the holder of one of these notes. Clear and, as it seems to me, decisive proof should be made under these circumstances of an intention on Katz's part, by the retention of the deed, to draw in or defraud other subsequent creditors, in order to require the Englewood property to be doubly liable in Katz's hands for the payment of Freudenthal's debts.

Upon the whole evidence in the case I conclude that the prior deeds of 1892 and 1895, held by Katz as security for the accommodation notes, were not fraudulent as against any of the com-

plainants, and that the subsequent absolute purchase of the property by the deed of June 6th, 1896, upon the assumption by Katz of the payment of $44,000 of these notes, being the full value of the property, was valid as against the complainants, whose liens were obtained subsequent to the delivery and record of this deed. It is charged in the bills that Freudenthal, after the record of this deed of June 6th, 1896, continued in possession of the property, but it appears that Katz (who was not entitled to possession under the previous deeds which were merely mortgages) took possession of the property shortly after the record of the deed and has since retained possession. This conclusion as to the validity of the unrecorded deeds renders it unnecessary to consider the further question as to whether if fraudulent as against creditors, this fraud was purged by the subsequent deed. The bill also brought into court certain defendants having or claiming rights as mortgagees, under a mortgage for $30,000, made by Katz to Eisele & King and by them assigned to the Western National Bank. This mortgage, as appears by the evidence, was given for the purpose of enabling Katz, with the assistance of Eisele & King (the latter being Katz's son-in-law), to raise money on the property for the purpose of meeting some of the Freudenthal notes. The money was raised by a loan from the Western National Bank upon the security of the mortgage, which was assigned to the bank, but after the attachments in these cases and filing of *lis pendens*, the loan was returned by Katz, and the mortgage was re-assigned to Eisele & King who now hold it as collateral for notes subsequently endorsed to assist Katz in making payments of the Freudenthal notes. No claim has been made on their behalf, that they now hold as against complainants any interest, in the lands or under the mortgage, as *bona fide* mortgagees superior to Katz's own title, and the case as against them must be considered as the case against Katz and involves no separate consideration. Their present interest in the mortgage is held with notice of complainants' claim.

The bills, therefore, will be dismissed. I will hear counsel of defendants as to whether costs should be allowed.